1  Reuben D. Nathan, Esq. (SBN 208436)
   **NATHAN & ASSOCIATES, APC**
2  2901 W. Coast Hwy., Suite 200
3  Newport Beach, CA 92663
   Office: (949) 270-2798
4  Email: rnathan@nathanlawpractice.com

5
   Ross Cornell, Esq. (SBN 210413)
6  **LAW OFFICES OF ROSS CORNELL, APC**
7  40729 Village Dr., Suite 8 - 1989
   Big Bear Lake, CA 92315
8  Office: (562) 612-1708
9  Email: rc@rosscornelllaw.com

10 Attorneys for Plaintiff, IRMA RIOS

11

12           **UNITED STATES DISTRICT COURT**

13           **EASTERN DISTRICT OF CALIFORNIA**

14

15 IRMA RIOS, on behalf of herself and all        Case No:
   similarly situated persons,
16
                                                   **CLASS ACTION COMPLAINT**
17              Plaintiff,
                                                      1) **CAL. PENAL CODE § 638.51**
18 v.                                                 2) **CAL. PENAL CODE § 631**
19 THE ESTEE LAUDER COMPANIES
   INC., a Delaware corporation,
20
21              Defendant.
22

23

24

25

26

27

28

                              1

Plaintiff IRMA RIOS ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant THE ESTEE LAUDER COMPANIES INC., a Delaware corporation (referred to herein as "Defendant" or "ESTÉE LAUDER"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.maccosmetics.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies, that function as unlawful pen registers and/or trap and trace devices, to capture detailed information about users' electronic communications such as Internet Protocol ("IP") addresses, session data, and clickstream activity in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

///

5.      When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.      When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- • Google Trackers (Analytics 4 / Tag Manager / DoubleClick)
- • Facebook Tracker
- • FullStory Tracker
- • Contentsquare Tracker

7.      The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.      The Trackers are operated by distinct third parties, including Google LLC (Google Analytics and Google Tag Manager Trackers), Meta Platforms, Inc. (Facebook Pixel Tracker), FullStory, Inc. (FullStory Tracker), and Contentsquare SAS (Contentsquare Tracker). Defendant aids, employs, agrees, and conspires with these entities by embedding and executing their tracking code on the Website. When a visitor loads the Website, the browser initiates outbound connections to third-party servers such as analytics.google.com, connect.facebook.net, edge.fullstory.com, and c.contentsquare.net, transmitting user identifiers, page URLs, referrer strings, and session data. Each of these third parties maintains network or data-center infrastructure in California—including Google's cloud and advertising regions in Los Angeles and San Jose, Meta's edge exchanges at Equinix LA1 and SV1, Akamai-served FullStory endpoints in Los Angeles and San Jose, and Contentsquare's CDN-routed telemetry through California edge nodes. By enabling and benefiting from these integrations,

Defendant causes user communications to be copied and transmitted to third-party servers for behavioral profiling, advertising optimization, and data-monetization activities.

9.      On information and belief, Defendant's Website is further equipped with additional third-party trackers that function as pen registers and/or trap-and-trace devices or processes, including but not limited to those operated by Xandr/AppNexus, LiveRamp, Teads, LinkedIn, Pinterest, Snapchat, The Trade Desk, TikTok, Contentsquare, Hotjar, Noibu, Medallia/Kampyle, Tealium IQ, Akamai mPulse/SOASTA, Optimizely, PowerReviews, Pixlee, Braze (Appboy), Yahoo Analytics/DSP, Bizrate/Shopzilla, LivePerson, Clinch, Onetrust/CookieLaw, Hexagon Analytics, Micpn/Sc-static, and Reddit Pixel; collectively, these non-primary trackers capture and transmit Plaintiff's and Class Members' addressing, routing, and signaling information—including page URLs, referrers, device identifiers, and unique session tokens—to multiple external servers without consent or court authorization, in violation of the California Invasion of Privacy Act; these services initiate outbound connections or cookie writes prior to any consent layer, establishing intentional acquisition of application-layer dialing and signaling information; Teads and LiveRamp are registered California data brokers; Xandr, Pinterest, TikTok, and Meta, maintain declared exchange and infrastructure presence in Los Angeles or San Jose, further supporting purposeful direction toward this forum.

10.     Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, installed fonts, color depth, timezone, operating system, pages visited, session duration, scroll depth and/or mouse movement, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP (collectively, "User Information"). This information is used for behavioral profiling, geolocation tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then uses the data collected by the Trackers, and in conjunction with the Third Parties operating them, for targeted

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

marketing and advertising that enable Defendant to monetize its Website. That is, Defendant and the Third Parties benefit from the Third Parties' unconsented-to collection of Plaintiff's and Class Members' personal information.

11.    Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

12.    The invasiveness of Defendant's data collection is compounded by the entities operating the Trackers embedded on the Website, which collect Plaintiff's and Class Members' IP addresses, device identifiers, and user interaction metadata. Google Trackers (Analytics, Tag Manager, and DoubleClick), Facebook Tracker (Meta Pixel), FullStory Tracker, and Contentsquare Tracker each aggregate information collected from the Website with behavioral and device data from other digital properties. Google and Meta use these data streams to expand unified advertising identifiers and segment users across their ad networks; FullStory and Contentsquare record, reproduce, and analyze session-level interaction data—including mouse movement, scroll position, click activity, and viewport dimensions—to generate behavioral profiles used for marketing optimization and user-experience analytics. Collectively, these entities enrich persistent user profiles with cross-site identifiers and provide those profiles to advertisers and analytics clients for retargeting and personalized marketing, thereby extending the interception of Plaintiff's and Class Members' communications beyond the Website and into the broader advertising ecosystem.

13.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  14.    By installing and activating the Trackers without obtaining user consent or

2  a valid court order, Defendant violated CIPA § 638.51, which prohibits the use of pen

3  registers and trap and trace devices under these circumstances.

4  15.    Generalized references herein to users, visitors and consumers expressly

5  include Plaintiff and the Class Members.

6  **II.    <u>PARTIES</u>**

7  16.    Plaintiff IRMA RIOS is a California citizen residing in Solano County and

8  has an intent to remain there. Plaintiff was in California when she visited the Website,

9  which occurred during the class period prior to the filing of the complaint in this matter.

10  17.    Plaintiff visited the Website for personal purposes on multiple

11  occasions during the class period including but not limited to on October 14, 2025.  On

12  such occasion(s), Plaintiff interacted with the Website's homepage (among others)

13  which is where Defendant intentionally embedded the Trackers on Plaintiff's device for

14  the purpose of sharing Plaintiff's personal signaling, routing and addressing information

15  as described herein.

16  18.    Defendant THE ESTEE LAUDER COMPANIES INC. is a Delaware

17  corporation that owns, operates, and/or controls the Website which is an online platform

18  that offers goods and services to consumers.

19  19.    ESTÉE LAUDER is one of the world's leading manufacturers and

20  marketers of prestige cosmetics, skincare, fragrance, and hair care products. Founded in

21  New York in 1946, Estée Lauder now operates a global portfolio of more than thirty

22  beauty brands, including MAC Cosmetics, Clinique, La Mer, Bobbi Brown, and Estée

23  Lauder. As of 2025, the company maintains hundreds of retail boutiques, counters, and

24  partner locations throughout California and worldwide, and serves millions of

25  consumers annually through its online commerce platforms.

26  20.    ESTÉE LAUDER employs tens of thousands of people globally, with core

27  operations centered in product development, marketing, digital commerce, and retail

28  distribution. Its MAC Cosmetics brand is one of the most prominent in its portfolio,

specializing in professional-grade makeup products and artist-driven collaborations. MAC sells directly to consumers through physical retail stores, authorized partners, and the Website, which offers personalized shopping experiences, product recommendations, loyalty rewards, and access to exclusive collections and limited-edition launches.

21.     The Website is a cornerstone of ESTÉE LAUDER'S global e-commerce infrastructure and serves as a full-service retail platform. It allows consumers to browse, customize, and purchase a wide range of MAC products, including cosmetics, skincare, tools, and accessories. The website features virtual try-on technology, shade-matching assistance, live chat with beauty advisors, and integrated order fulfillment and delivery systems designed to serve users across the United States, including California.

22.     The Website is also a core component of ESTÉE LAUDER'S global digital marketing and analytics ecosystem, linking MAC's online storefront to ESTÉE LAUDER'S broader enterprise data and advertising infrastructure. The platform integrates with Estée Lauder's mobile applications, email marketing systems, loyalty programs, and analytics partners to optimize engagement and drive targeted advertising. Beyond serving as a sales portal, the website functions as a customer data and behavioral tracking hub—collecting, aggregating, and analyzing users' browsing activity, purchase intent, and interaction patterns to facilitate advertising segmentation, personalization, and retargeting across ESTÉE LAUDER'S digital properties and third-party platforms.

### III.    <u>JURISDICTION AND VENUE</u>

23.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

24.     The Website purposefully integrates major advertising and analytics vendors and communicates with their collection endpoints during page load. POST

requests to https://analytics.google.com/g/collect carry the GA4 property identifier tid=G-WW8G5C9VYP and event fields including en=page_view, document location dl=https://m.maccosmetics.com/, document title dt=MAC Cosmetics | Beauty and Makeup Products – Official Site, referrer dr=https://m.maccosmetics.com/, and user-agent identifying a mobile Safari client (*see* Figures 9–12 below). Those same sessions set and read Google Analytics cookies (ga and ga_WW8G5C9VYP) visible in DevTools Application storage (*see* Figures 13–14 below). Google publicly lists active California regions for its advertising/cloud footprint in Los Angeles (LAX) and San Jose (SJC).[1]

25.    Meta's    pixel    fires    as    the    browser    loads https://connect.facebook.net/en_US/fbevents.js    and    issues    GET    requests    to https://www.facebook.com/tr/?id=4004449104176588&ev=PageView        (and …&ev=ViewContent), with the referrer https://m.maccosmetics.com/ and a mobile Safari user-agent (Figures 15–20). DevTools also records an _fbp cookie set on the Website's domain (Figures 19–20). Meta (AS32934) discloses peering and exchange presence at Equinix Los Angeles (LA1) and Equinix San Jose (SV1).[2]

26.    The Website also operates session-replay/experience analytics. For FullStory, the HAR shows fs.js loading from edge.fullstory.com and recurring POSTs to https://rs.eu1.fullstory.com/rec/bundle/v2 with SessionId=8da40a0d-0706-4ce5-8996-48bd934c374c, UserId=4cad89b1-95d9-42f0-a63c-0d84bc963e6e, and page identifiers, with the referrer https://m.maccosmetics.com/ (Figures 21–22, 24). Name resolution for the telemetry host includes requests to 17de4c1f.akstat.io, which CNAMEs to …edgekey.net, an Akamai edge network hostname (Figure 23). Akamai publicly documents California edge locations in Los Angeles and San Jose.[3]

/ / /

---

[1] **Google Cloud/Ads footprint (California regions).** Google Cloud Locations page listing Los Angeles (LAX) and San Jose (SJC) regions: https://cloud.google.com/about/locations.
[2] **Meta Platforms (AS32934).** PeeringDB record showing exchange points including Equinix LA1 and Equinix SV1: https://www.peeringdb.com/net/32934.
[3] **Akamai California edge presence.** Akamai public locations/edge map showing Los Angeles and San Jose POPs: https://www.akamai.com/locations.

27.    The Website further transmits behavioral events to Contentsquare: the HAR contains POSTs to https://c.contentsquare.net/v2/events with a unique user identifier (uu=20695f15-d104-af81-e93e-…), version v=15.140.1, and page metrics, with the referrer https://m.maccosmetics.com/ (Figures 27–28). DNS lookups in the capture resolve c.contentsquare.net via c.bf.contentsquare.net, and t.contentsquare.net resolves to Amazon-owned address space (Figure 27), while Contentsquare's delivery also operates over standard CDNs. Public network maps for Akamai and Cloudflare both show California POPs in Los Angeles and San Jose (Cloudflare also in Fremont).[4]

28.    Additional marketing/ads integrations are active on the Website—TikTok's _ttp cookie, Pinterest's ct_ua entry, and Adobe-related keys alongside Google cookies (Figures 13–14, 19–20, 29). Adobe's Experience Cloud properties (adobedtm.com, demdex.net, omtrdc.net) commonly serve from Adobe-operated infrastructure, and Adobe's Trust Center identifies California data-center operations in San Jose and San Francisco.[5] Microsoft/Xandr (adnxs.com) appears in the vendor set the Website is capable of reaching; Xandr's peering record (AS29791) lists Los Angeles and San Jose exchanges.[6] Comscore's scorecardresearch.com appears in the Website's audience-measurement stack, and Comscore publicly identifies California facilities supporting its network.[7]

29.    Defendant configured and executed Google Analytics 4 and Meta Pixel, and also enabled session-replay and UX measurement vendors (FullStory and Contentsquare) during ordinary browsing of the Website, with the requests carrying page

---

[4] **Cloudflare California edge presence.** Cloudflare global network map listing Los Angeles, San Jose, and Fremont: https://www.cloudflare.com/network/.
[5] **Adobe Experience Cloud (California data centers).** Adobe Trust Center—data-center operations including San Jose and San Francisco: https://www.adobe.com/trust/compliance/data-center.html.
[6] **Microsoft/Xandr (AS29791).** PeeringDB record listing Los Angeles and San Jose exchanges: https://www.peeringdb.com/net/29791.
[7] **Comscore facilities.** Comscore policies/disclosures page describing network operations and facility footprint (including California locations referenced therein): https://www.comscore.com/About/Policies-and-Disclosures.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

URL, title, referrer, user-agent, and vendor-specific identifiers precisely as shown in Figures 9–12, 15–20, and 21–29. Those vendors—Google, Meta, Akamai-served telemetry for FullStory, Contentsquare over standard CDNs, Adobe, Xandr/Microsoft, and Comscore—each maintain publicly documented California exchange points or data-center presence in Los Angeles, San Jose, San Francisco, or Fremont. This combination of (a) deliberate deployment of ad/analytics code that captures user communications on the Website and (b) routing that engages vendors with declared California infrastructure constitutes purposeful direction and express aiming at California's market consistent with *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1231 (9th Cir. 2011), and decisions applying that framework in data-interception cases; it also supports the foreseeability of in-forum privacy effects under *Calder v. Jones*, 465 U.S. 783 (1984).

30. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) Plaintiff resides in this District; and (4) the injury to Plaintiff occurred within this District.

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

31. Enacted in 1967, the California Invasion of Privacy Act is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

32. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order. Cal. Penal Code § 638.51(a).

33.   A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication. Cal. Penal Code § 638.50(b).

34.   Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents. Cal. Penal Code § 638.50(b).

35.   In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

36.   Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

37.   Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

38.   Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line, capturing the incoming information.

39.   Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024)

(finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

40.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. *Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).

41.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. *See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).

42.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

/ / /

**2.**    ***The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

43.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.,* what images to load, what text should appear, or what music should play.

44.    In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser. The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties. These Third Parties, through their Trackers, also set cookies on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

45.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1:**



46.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, the User Information, is used to profile users and facilitate targeted advertising.

47.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

48.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers. Nor did Defendant obtain a court order before installing or using the Trackers.

49.    An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (*e.g.*, 191.145.132.123). IPv4 is the traditional format of IP addresses and, because it has a

finite amount of combinations, it is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[8]

50.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices. IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

51.    Public IP addresses are globally unique identifiers assigned by Internet Service Providers ("ISPs") that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

52.    Public IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP. This geolocation capability is leveraged by online advertising and user identification services.

53.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can

---

[8]    *See*, *e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

54.     The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

55.     An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). A lot can be gleaned from knowing the phone number that is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

56.     The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[9]

/ / /

/ / /

_____

[9] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address.  So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

57.     Thus, the differences between public and private IP addresses are as follows:[10]

**Figure 3:**

| Category | Private IP address | Public IP address |
| --- | --- | --- |
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[10] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

58.    A public IP address is therefore "routing, addressing, or signaling information." A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

59.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

60.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

61.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[11]

62.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined. Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[12]

63.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[13] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their

---

[11] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[12] *IP Targeting: Understanding This Essential Marketing Tool*, AᴄᴄᴜDᴀᴛᴀ (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[13] *Location-Based Targeting That Puts You in Control*, Cʜᴏᴏᴢʟᴇ, https://choozle.com/geotargeting-strategies/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

interests."[14] Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[15] because "[c]ompanies can use an IP address … to personally identify individuals."[16]

64.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience. Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[17] For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[18]

65.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[19]

66.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[20]

---

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[15] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[16] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[17] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[18] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[19] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV5-5maUaAgtNEALw_wcB.

[20] *Id.*

67.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[21] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[22]

68.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[23] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[24]

69.    The collection of IP addresses here is particularly invasive here: As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[25]

70.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append

---

[21] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

71.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[26]

72.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[27]

73.    Often times, third-party scripts are installed on websites "for advertising purposes."[28]

74.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[29]

75.    Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

76.    As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members'

---

[26] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[27] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[28] *Id.*

[29] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

77.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

78.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

79.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.     *The Use of Trackers or Beacons and Digital Fingerprinting***

80.     Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    session and collect detailed behavioral and technical information, which is then

2    transmitted to external third-party servers without the users' active awareness.

3        81.    The Trackers also causes additional data points to be sent from Plaintiff's

4    and Class Members' browser to the Third Parties, which are meant to uniquely identify

5    users across sessions and devices. In addition to the public IP address, key elements

6    include the user-agent string (browser, operating system, and device type) and device

7    capabilities such as supported image formats and compression methods. Persistent

8    identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be

9    tracked even after clearing standard session data like cookies. Advanced methods like

10   fingerprinting and server-side matching remain unaffected by cookie deletion.

11   Combined, these elements form a detailed, unique fingerprint that allows for cross-site

12   tracking and behavioral profiling.

13       82.    This process, known as digital fingerprinting, involves compiling various

14   data points such as browser version, screen resolution, installed fonts, device type, and

15   language settings to generate a unique identifier for each user. Fingerprinting can be used

16   to recognize repeat visits and correlate activity across different sessions or sites. When

17   combined with form inputs, login activity, or third-party enrichment, fingerprinting can

18   contribute to broader profiling of a user's interests, affiliations, or behaviors.

19       83.    When combined with additional tracking mechanisms such as cookies,

20   login data, and third-party enrichment services, fingerprinting contributes to user

21   profiling. This may include inferring location, browsing habits, consumer preferences,

22   and potentially associating these patterns with known user identities. A sufficiently

23   detailed digital fingerprint especially when correlated with other identifiers such as email

24   addresses, form submissions, or third-party databases, can enable the reidentification of

25   a user.

26       84.    The ability to associate a persistent digital profile with a specific individual

27   using techniques such as digital fingerprinting has led to the development of a data

28   industry known as identity resolution. Identity resolution involves recognizing users

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

85.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

86.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

87.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### 4.    *Plaintiff And Class Members' Data Has Financial Value*

88.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[30]

89.    Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[31]

90.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[32]

91.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[33]

92.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an

---

[30] Ian Cohen, *Are Web-Tracking Tools Putting Your Company at Risk?*, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444.

[31] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[32] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[33] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[34]

93.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[35]

94.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

95.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

96.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms,

---

[34] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[35] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

allowing Defendant to deliver retargeted ads to users who previously visited the Website,
offer promotional incentives to users who showed purchase intent, and build "lookalike
audiences" that target users with similar behaviors or characteristics. These practices
significantly improve advertising efficiency and increase the likelihood of converting
user engagement into actual sales.

97.     Defendant has a strong financial incentive to deploy the Trackers on its
Website without obtaining user consent. By enabling the collection of IP addresses and
device-level identifiers through these technologies, Defendant facilitates integration into
real-time bidding ecosystems. These systems rely on bidstream data such as IP address,
device type, screen resolution, and referral information to assess the value of a potential
ad impression. This enables Defendant and its partners to participate in data-driven ad
targeting, increase the value of its advertising inventory, and track users across sessions
and websites, all of which provide economic benefit despite the privacy implications to
users.

98.     IP addresses are a valuable data point in digital advertising and tracking
systems. They can be used to approximate a user's geographic location, often down to
the city or ZIP code level, enabling location-based targeting. When combined with
cookies, browser metadata, and device identifiers, IP addresses contribute to persistent
user tracking across sessions and websites. They also assist advertisers and data brokers
in linking anonymous browsing activity to existing user profiles, which enhances ad
targeting precision and increases the commercial value of each tracked interaction. IP
addresses therefore constitute "routing, addressing, or signaling information" protected
under CIPA § 638.50(b).

99.     When users' data is collected without meaningful consent and monetized,
they lose control over who can access, use, or distribute their personal information. Data
brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device
IDs, and cookies with other personal data to construct detailed consumer profiles.
Information initially gathered in one context, such as browsing a retail website, is

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6.      Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy**

100.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

101.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

102.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

103.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### a. Data Brokers And Real-Time Bidding: The Information Economy

*Data Brokers*

104.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[36] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions. Cal. Civ. Code § 1798.99.80(c).

105.    Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a). The Teads and LiveRamp trackers employed by Defendant on the Website are operated by registered California data brokers.

106.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[37] Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[38]

107.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)." The former "is data that has been collected and is actual," such as websites visited." Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.

---

[36] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.
[37] SHERMAN, *supra*, at 2.
[38] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[39]

108.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[40]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[41]

109.    This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[42]

110.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to

---

[39] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[40] SHERMAN, *supra*, at 1.
[41] *Id.*
[42] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

2

> how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements.  Many

3

4

> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

5

> …

6

7

8

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[43]

9    111.    Similarly, as the report from NATO noted, corporate data brokers cause

10 numerous privacy harms, including but not limited to depriving users of the right to

11 control who does and does not acquire their personal information, unwanted

12 advertisements that can even go as far as manipulating viewpoints, and spam and

13 phishing attacks.[44]

14 / / /

15

16

17 / / /

18

19

20 / / /

21

22

23 / / /

24

25

26 / / /

27

28
---
[43] *Id.*
[44] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 4:**



112.   As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[45]

///

_____

[45] *Id.* at 11.

113.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[46]

114.   These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[47]

115.   In short, by collecting IP addresses, Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

116.   As a result of Defendant's installation of trackers operated by data brokers such as LiveRamp and Teads, together with numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is appended to existing profiles maintained by those brokers or used to generate new ones. This linkage is accomplished through the collection of IP addresses, device metadata, and other user information transmitted by the browsers of Defendant's Website visitors.

117.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by

---

[46] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[47] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

118.    Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

119.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[48]

120.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the Trade Desk is[49]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact."[50] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[51]

121.    In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like The Trade Desk help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

---

[48] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[49] HTTPS://WWW.THETRADEDESK.COM/OUR-DEMAND-SIDE-PLATFORM ("The leading demand-side platform for data-driven advertising").

[50] *Id.*

[51] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

122.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, *e.g.*, Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[52]

## Figure 5:



123.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

---

[52] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities. As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker]. DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers. The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[53]

**Figure 6:**



124. In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user. If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

/ / /

---

[53] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

125.   Likewise, a DSP like The Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

126.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

127.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

     a.    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

     b.    "send[ing] sensitive data across geographic borders."

     c.    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[54]

128.   Given The Trade Desk operates a DSP here, the last point is particularly relevant, as it means The Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

/ / /

---

[54] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    129.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned

2    that "[c]onsumers' privacy is violated when entities disclose their information without

3    authorization or in ways that thwart their expectations."[55]

4    130.  For these reasons, some have characterized "real-time bidding" as "[t]he

5    biggest data breach ever recorded" because of the shear number of entities that receive

6    personal information[56]:

7    **Figure 7:**



20    131.  All of this is in line with protecting the right to determine who does and

21    does not get to know one's information, a harm long recognized at common law and one

22    the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985)

23    (noting the CIPA was drafted with a two-party consent requirement to protect "the right

24    to control the nature and extent of the firsthand dissemination of [one's] statements");

25    *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-

---

[55] Geoghegan, *supra*.
[56] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

132.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like LiveRamp and Teads who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website. The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

133.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies and match the different IDs they assign for the same user while they browse the web."[57] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[58]

134.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator*

---

[57] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[58] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

2

*advertiser.com this time, using a specifically crafted URL (step 3).*

*…*

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[59]

**Figure 8:**



135.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2

---

[59] Papadopoulos, *supra*, at 1433.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  knew as "user123" are the same person), they can "track a user to a much larger number

2  of websites," even though that "do not have any collaboration with" the third party.[60]

3      136.   On the flip side, "CSync may re-identify web users even after they delete

4  their cookies."[61] "[W]hen a user erases her browser state and restarts browsing, trackers

5  usually place and sync a new set of userIDs, and eventually reconstruct a new browsing

6  history."[62] But if a tracker can "respawn" its cookie or link to another persistent identifier

7  (like an IP address), "then through CSync, all of them can link the user's browsing

8  histories from before and after her state erasure.  Consequently: (i) users are not able to

9  abolish their assigned userIDs even after carefully erasing their set cookies, and (ii)

10  trackers are enabled to link user's history across state resets."[63]

11      137.   Thus, "syncing userIDs of a given user increases the user identifiability

12  while browsing, thus reducing their overall anonymity on the Web."[64]

13      138.   Cookie syncing is precisely what is happening here. When each of the

14  Trackers are installed on Website users' browsers, they are calling and/or syncing their

15  cookies with other third parties on the Website. The result of this process is not only that

16  a single user is identified as one person by these multiple third parties, but they share all

17  of the information about that user with one another (because the cookie is linked to a

18  specific user profile). This prevents users from being anonymous when they visit the

19  Website.

20      139.   To summarize the proceeding allegations, data brokers focus on collecting

21  as much information about Website users as possible to create comprehensive user

22  profiles, and the Trackers sync with numerous other data brokers that do the same. The

23  Third Parties collect IP addresses, Device Metadata, User Information, and unique user

24  IDs in the first instance, but those pieces of information are connected to information the

---

[60] Papadopoulos, *supra*, at 1434.

[61] *Id.*

[62] *See id.*

[63] *Id.*

[64] *Id.* at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

140.    Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

141.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

142.    Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

143.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

144.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

145.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

146.   The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

147.   The Trade Desk performs identity enrichment and cross-device tracking functions that expand the scope of behavioral data captured through the Website. By linking browsing activity with pseudonymous identifiers and participating in identifier syncing across advertising networks, these entities create detailed, persistent user profiles that extend beyond a single browsing session or device. The Trade Desk utilizes frameworks like Unified ID 2.0 to map users across domains. These practices convert

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  raw behavioral data collected on the Website into monetizable, targetable audience

2  segments within the programmatic advertising ecosystem.

### V.    SPECIFIC ALLEGATIONS

4  *1.    The Google Trackers*

5  148.   The Google Trackers are digital analytics and tag-management

6  technologies operated by Google LLC, consisting of Google Analytics 4, DoubleClick

7  and Google Tag Manager. Together, these tools enable Google and its advertising and

8  analytics clients to collect detailed interaction data from visitors to the Website, monitor

9  engagement, and coordinate the deployment of additional tracking scripts. Google Tag

10  Manager functions as a container that injects other tracking tags into the Website's code,

11  while Google Analytics measures and reports user behavior in granular detail for

12  profiling, marketing optimization, and targeted advertising purposes.

13  149.   When implemented on the Website, the Google Trackers collect a broad set

14  of user metadata, including visited URLs, session timestamps, referrer headers, and

15  behavioral interaction data such as page views, navigation paths, and engagement events.

16  Google Analytics further captures detailed device and browser attributes, including IP

17  address, screen resolution, operating system, and language settings. These data points

18  are tied to persistent browser identifiers placed through cookies or local-storage objects,

19  allowing Google to trace users across multiple sessions, devices, and affiliated websites

20  to form longitudinal behavioral profiles.

21  150.   The Google Trackers continuously monitor user engagement on the

22  Website, including page views, link clicks, and browsing patterns, and transmit those

23  interaction signals to Google's analytics and advertising infrastructure via encrypted

24  requests to domains such as www.google-analytics.com, analytics.google.com, and

25  www.googletagmanager.com. Google Tag Manager is embedded as part of the initial

26  page load and autonomously deploys additional Google advertising tags without any

27  user action, thereby enabling ongoing behavioral monitoring and audience segmentation

28  across Google's advertising ecosystem.

151.    Figure 9 below shows request and response headers documenting the browser's addressing, routing, and signaling exchange with the host domain m.maccosmetics.com. The addressing and routing components are reflected in fields such as Access-Control-Allow-Origin, which designates "https://m.maccosmetics.com" as the authorized origin, and Alt-Svc, which specifies alternate protocol paths through "h3=:443" and "h3-29=:443," identifying the transport routes used to reach the remote server. The signaling layer is represented by Access-Control-Allow-Credentials set to "TRUE," Cache-Control showing "no-cache, no-store, must-revalidate," and Cross-Origin-Opener-Policy-Report-Only "same-origin; report-to=ascnsrsggc158:0," each governing how the client and server maintain session permissions, cache directives, and isolation policies. Behavioral metadata appears in the Content-Security-Policy-Report-Only directive, which contains a report-uri field pointing to "https://csp.withgoogle.com/csp/…"[full URL omitted], a live endpoint that receives event-level telemetry describing user interactions that trigger browser security reports. Collectively, these entries establish the complete metadata handshake by which the browser addressed, routed, and signaled its connection to the host. The displayed data thus provides verifiable network records evidencing the endpoint identification and communication parameters of the observed exchange.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 9:**



152.   Figure 10 below shows a real-time HTTPS request and response captured in Fiddler between the browser and analytics.google.com. The addressing and routing components identify the destination domain analytics.google.com using the HTTPS protocol, confirming an outbound connection to an external endpoint. The URL path "/g/collect/…[full URL omitted]" includes structured parameters such as "v=2," "tid=G-WW8G5C9VYP,"and"gtm=45je5am0v887035913za200zd8870359138_p=176129954 35438," representing session-specific request metadata. Signaling headers including "Host: analytics.google.com," "Connection: keep-alive," "Pragma: no-cache," and "Cache-Control: no-cache, no-store" are visible along with behavioral metadata in fields such as "Referer: https://m.maccosmetics.com/…[full URL omitted]" and "User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X)." The displayed data, captured in real time through Fiddler, constitutes verifiable network evidence of addressing, routing, and signaling metadata exchanged between the client browser and the analytics.google.com endpoint.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10:**



153.    Figure 11 below shows a real-time Fiddler capture of HTTPS requests and responses exchanged between the client browser and the host domains analytics.google.com and analytics.tiktok.com. The addressing and routing components are reflected in the destination URLs "https://analytics.google.com/g/collect/…[full URL omitted]" and "https://analytics.tiktok.com/18n/pixel/events.js…[full URL omitted]," each representing an active outbound connection recorded during the live session. The visible query string lists parameter–value pairs including "tid=G-WW8G5C9VYP," "dl=https://m.maccosmetics.com/," "dt=MAC Cosmetics | Beauty and Makeup Products Official Site," and "ep.brand_id=mac_us." Signaling and session-state metadata appear in "_p=1761299543543," "_s=1," "cid=629705125.1761300000," and "ep.elc_session_id=sid_1761299543513," which display the precise identifiers and sequence values exchanged in-flight. Behavioral metadata fields "en=page_view," "ep.event_type=view," and "ep.page_type=home" capture the recorded interaction state at the moment of transmission. The displayed data, collected through a live network inspection tool, provides verifiable records of addressing, routing, and signaling

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

metadata as they occurred in real time between the browser and the identified remote hosts.

**Figure 11:**



154.   Figure 12 below shows cookie metadata associated with Google domains as stored and transmitted by the client browser. The visible entries include Name–Value pairs such as "ga=GA1.1.629705125.1761299332" and "ga_WW8G5C9VYP=GS2.1.s17612993315o1$g1$t17612995…," each corresponding to identifiers linked to the domain maccosm… and referencing the Google Analytics property ID "G-WW8G5C9VYP." The figure lists associated fields including "Expires / Max-Age=2026-11-28T09:52:42.471Z" and "SameSite=Lax," alongside a "Secure" attribute that controls how the cookie is transmitted across HTTPS connections. These values appear alongside other protocol-level metadata columns such as "Domain," "Path," and "Priority," which define the scope, routing, and signaling conditions under which the cookies operate. The displayed data therefore constitutes verifiable network metadata evidencing the presence of Google Analytics identifiers, connection attributes,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  and signaling configurations governing their transmission between the browser and
2  Google-associated endpoints.

**Figure 12:**



16  155.  Figure 13 below shows a real-time packet-level capture recorded in Fiddler
17  reflecting an HTTPS request and response exchange with the domain
18  analytics.google.com. The capture displays a 204 response code and a visible request
19  path beginning "/g/…" [full URL omitted]. The request headers include
20  Host=analytics.google.com, Connection=keep-alive, Pragma=no-cache, Cache-
21  Control=no-cache, and a User-Agent string identifying "Mozilla/5.0 (iPhone; CPU
22  iPhone OS 18_5 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko)
23  Version/18.5 Mobile/15E148 Safari/604.1." Parameter fields within the request show
24  dt="MAC Cosmetics | Beauty and Makeup Products Official Site," and
25  cid=629705125.1761299332, together evidencing the direct transmission of a full
26  referrer URL, document title, and client identifier. The response headers include Access-
27  Control-Allow-Credentials=true, and Cross-Origin-Resource-Policy=cross-origin,
28  demonstrating the server's acknowledgment of the browser's origin and credential

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    context. The displayed data therefore constitutes contemporaneous network evidence

2    showing the precise addressing, routing, and signaling metadata exchanged between the

3    client browser and the analytics.google.com endpoint in real time.

**Figure 13:**



17    156.  Figure 14 below shows stored cookie name–value pairs associated with

18    multiple host domains, including youtube.com, bizrate.com, tiktok.com, and several

19    maccosmetics.com subdomains. The entries include identifiers such as

20    ga=GA1.1.629705125.1761299332,ga_WW8G5C9VYP=GS2.1.s1761299331S01$g1$

21    t17612995..., and gcl_au=1.1.712089332.1761299339, along with fields labeled

22    Domain, Expires/Max-Age, Size, HttpOnly, Secure, SameSite, and Priority. These

23    parameters show how session identifiers and expiration values were written to the

24    browser across different origins, preserving cross-site connection context with each

25    endpoint. The displayed data provides contemporaneous network evidence of

26    addressing, routing, and signaling metadata that define the stored communication state

27    between the client and the identified remote domains.

28    / / /

50

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 14:**



157.  Figures 9 through 14 collectively demonstrate the operation of Google's embedded tracking infrastructure on the Defendant's website and its role in capturing and preserving user behavioral metadata. Figures 9 through 11 show network exchanges between the browser and analytics.google.com, including visible request and response headers that record connection parameters, referrer information, and unique identifiers transmitted during active page loads. Figures 12 and 13 provide real-time evidence of outbound communications to Google Analytics servers, revealing the live negotiation of signaling and routing parameters linking user sessions on m.maccosmetics.com to Google's analytics endpoints. Figure 14 then shows the persistent client-side artifacts associated with those transactions—cookies labeled "ga," "ga_WW8G5C9VYP," and "gcl_au"—that store Google-issued identifiers tied to individual sessions and devices. Viewed together, these figures depict a continuous technical chain of addressing, signaling, and storage activity evidencing how the Defendant's website integrated Google's tracking technologies to collect, associate, and retain behavioral metadata about users' interactions.

51

1    158.   Defendant surreptitiously installed and executed the Google Trackers onto
2    users' browsers by embedding Google Tag Manager in the Website's source code. When
3    a user visits the Website, their browser automatically executes this container script,
4    which dynamically injects Google Analytics and initiates outbound network requests to
5    Google's servers, transmitting metadata including page URL, referrer information,
6    browser details, and session identifiers as part of a third-party tracking, profiling, and
7    advertising system.

8    159.   The Google Trackers are at least a "process" because it is software that
9    identifies consumers, gathers data, and correlates that data.

10   160.   The Google Trackers are at least a "device" because in order for software
11   to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt
12   Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

13   161.   The Google Trackers function as a pen register and/or trap and trace device
14   under the California Invasion of Privacy Act because they capture outgoing signaling
15   data such as URLs visited, click paths, timestamps, and referrer headers and also process
16   incoming metadata such as analytics responses and cookie-based session identifiers.
17   These transmissions occur automatically during page load and without user
18   participation, enabling Google to continuously log user behavior and associate it with
19   broader tracking profiles.

20   162.   Defendant never obtained a court order permitting the installation of a pen
21   register or trap and trace device or process and did not obtain Plaintiff's or the Class
22   Members' express or implied consent to install the Google Trackers on Plaintiff's and
23   Class Members' browser or to collect or share data with Google.

24   163.   Consequently, the Google Trackers violate CIPA regarding unauthorized
25   use of a pen register and/or trap and trace device without prior consent or court order.

26   **2.    *The Facebook Tracker***

27   164.   The Facebook Tracker is a web-based analytics and advertising technology
28   operated by Meta Platforms, Inc., consisting of the Meta Pixel and its associated event-

1  processing endpoints at facebook.com and connect.facebook.net. The Meta Pixel
2  functions as an embedded JavaScript tag that records user interactions on the Website
3  and transmits those events to Meta's servers for processing within its advertising and
4  audience-measurement network. When deployed, the Meta Pixel enables Meta and the
5  Website operator to identify, categorize, and measure user behavior across sessions and
6  devices, facilitating cross-platform profiling and advertising optimization.

7      165.   Once installed on the Website, the Facebook Tracker executes
8  automatically when a page loads, initiating outbound HTTPS requests to facebook.com
9  and connect.facebook.net domains. These requests carry structured URL parameters
10  such as "id," "ev," "dl," "rl," and "if," corresponding to pixel identifiers, event types,
11  document locations, and referrer links. Each transmission includes browser and device
12  metadata such as IP address, user agent string, screen dimensions, and locale settings.
13  The Pixel also reads and writes persistent identifiers—including the "_fbp" and "_fbc"
14  cookies—which allow Meta to associate distinct browsing sessions with a single user
15  profile across multiple sites.

16      166.   Through this configuration, the Facebook Tracker continuously monitors
17  engagement actions such as page views, button clicks, and navigation events, encoding
18  those actions into telemetry values that are transmitted to Meta's analytics and
19  advertising systems. The exchanged metadata includes referrer URLs, document titles,
20  timestamps, and cookie-based session identifiers. These network exchanges occur
21  automatically during the browsing session without user interaction or consent,
22  transmitting behavioral and technical metadata from the client browser to Meta's
23  external servers.

24      167. Figure 15 below shows HTTPS requests to the external hosts
25  connect.facebook.net and facebook.com, each visibly associated with the loading and
26  execution of fbevents.js and subsequent pixel transmissions. The addressing and routing
27  components appear in the "Domain" column listing connect.facebook.net and
28  facebook.com, while the "Path" and "Url" fields show structured request paths such as

"/en_US/fbevents.js" and "/tr/…[full URL omitted]" identifying the resource endpoints accessed during page load. The visible entries include parameterized query strings beginning "id=400444910417658…" with appended values such as "ev=ViewContent" and "ev=PageView," each representing event-coded metadata within the request URLs. The "Method" column shows "GET," and the "Time" column records durations ranging from 0 ms to 290 ms, reflecting sequential live transmissions to the Facebook domains. The displayed data provides verifiable network evidence of addressing, routing, and signaling metadata documenting the HTTPS request sequence and connection parameters between the client browser and the Facebook endpoints.

**Figure 15:**



168.    Figure 16 below shows a real-time HTTPS request and response exchange captured in Fiddler between the browser and the host domain facebook.com. The visible GET request line identifies the destination URL beginning "www.facebook.com/tr/…[full URL omitted]" and includes parameter fields such as "id=400444910417658," "ev=PageView," "dl=https://m.maccosmetics.com/," and "referrer=https://m.maccosmetics.com/," showing the precise path and metadata

transmitted in-flight. The signaling headers include "Host: www.facebook.com," "Connection: keep-alive," "Pragma: no-cache," "Cache-Control: no-cache," and "User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X)," along with "Sec-Fetch-Site: cross-site" and "Sec-Fetch-Mode: no-cors." The response section displays "HTTP/1.1 200 OK" and a cache date "Fri, 24 Oct 2025 09:52:56 GMT," confirming a successful acknowledgment from the external host. The displayed data captures in real time the addressing, routing, and signaling metadata exchanged between the client browser and facebook.com during the observed connection.

**Figure 16:**



169. Figure 17 below shows a DNS query and response sequence involving the external hosts connect.facebook.net and facebook.com. The visible entries list "Standard query 0x618e A connect.facebook.net" and the corresponding "Standard query response 0x618e A connect.facebook.net CNAME scontent.xx.fbcdn.net A 157.240.3.29," followed by "Standard query 0x1265 A facebook.com" and "Standard query response 0x1265 A facebook.com CNAME star-mini.c10r.facebook.com A 157.240.3.35." The addressing and routing metadata therefore identify the queried hostnames, canonical

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

name records, and associated IP addresses resolved during session negotiation. The displayed data provides verifiable network evidence of addressing and routing activity establishing name resolution for the Facebook domains.

**Figure 17:**



170.    Figure 18 below shows stored cookie name–value pairs identifying browser session metadata associated with domains including mac..., m.m..., and bizra.... The visible entries include "_fbp=fb.1.1761299325293.250839270434858531," "_ga=GA1.1.629705125.1761299332," and "_ga_WW8G5C9VYP=GS2.1.s1761299331$o1$g1$t17612995…," along with fields labeled "Expires / Max-Age," "Secure," "SameSite," and "Priority." The addressing and signaling attributes define how these identifiers are scoped, transmitted, and retained within browser storage, showing cookie lifetime, transport requirements, and same-site policy. The displayed data constitutes direct evidence of stored addressing, routing, and signaling metadata documenting the persistent communication state between the browser and the identified domains.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 18:**



171.    Figure 19 below shows a Fiddler capture reflecting an HTTPS exchange with facebook.com. The request headers identify the client as an iPhone browser connecting to facebook.com with "Cache-Control: no-cache," "Accept-Encoding: gzip, deflate, br, zstd," and "User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X)." The connection originated from the homepage and the server responded "HTTP/1.1 200 OK" with a "Content-Type: text/plain" and "Strict-Transport-Security: max-age=31536000; includeSubDomains." The displayed data captures the live exchange between the client and facebook.com, evidencing the addressing and signaling parameters used to establish and maintain the HTTPS session.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 19:**



172.    Figure 20 below shows the browser's Application panel displaying multiple cookie records associated with distinct domains including mac.com, m.maccosmetics.com, and facebook.com. The table contains paired fields labeled "Name" and "Value," with visible identifiers such as "_fbp," "_ga," "_ga_WW8G5C9VYP," "_gcl_au," and "_yopix_uid," each paired with alphanumeric strings. The column headings further include "Expires / Max-Age," "Size," and "HttpOnly," indicating metadata attributes defining storage parameters for each cookie. The displayed data constitutes direct evidence of session-level metadata reflecting the client browser's stored identifiers, expiration intervals, and associated domains, documenting how session and identity information was persisted during the connection.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 20:**



173.  Figures 15 through 20 together depict the full operation of the Website's Facebook integration, showing how user activity on m.maccosmetics.com is invisibly relayed to Facebook's servers and linked with persistent identifiers stored in the user's browser. Figures 15–18 show outbound HTTPS requests from the Website to facebook.com with event parameters such as "ev=PageView," demonstrating that each time a page loads, behavioral data about the visit—what page was viewed, when, and from which referring address—is transmitted directly to Facebook. Figure 19 shows the Fiddler capture confirming the live network exchange between the user's device and facebook.com, evidencing the actual communication session that carries those event payloads. Figure 20 shows the browser's stored cookies, including the _fbp identifier and related parameters that allow Facebook to recognize returning visitors and match them to existing profiles. Viewed together, these figures illustrate a coordinated system in which the Website's embedded Facebook code collects and transmits behavioral and identifying information to a third-party advertising network for purposes of user profiling, cross-site recognition, and monetization of visitor data.

174.    Defendant surreptitiously installed, executed, and injected the Facebook Tracker onto users' browsers by dynamically injecting Meta's JavaScript pixel through Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Meta's servers and transmitting metadata, including the user's page URL, referrer, browser configuration, and other session-specific details. These tracking operations occur without any user interaction, allowing Meta to collect data from users' sessions silently and without their consent.

175.    The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

176.    The Facebook Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

177.    The Facebook Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata  to Meta's servers as soon as the page loads, often without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

178.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

179.    Consequently, the Facebook Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    ### 3.    *The FullStory Tracker*

2          180.    The FullStory Tracker, delivered through domains including fullstory.com

3    and akstat.io, is a third-party session replay and behavioral analytics tool operated by

4    FullStory, Inc. On the Website, this tracker is embedded directly into the site's source

5    code and executes automatically upon each visit. The embedded script initiates live

6    HTTPS connections between the user's browser and remote FullStory servers,

7    transmitting a stream of event data such as session identifiers, page identifiers,

8    timestamps, and interaction bundles. These transmissions occur contemporaneously

9    with user navigation, establishing a live, continuous channel through which FullStory

10   receives data about the user's actions and communications with the Website.

11         181.    Once activated, the FullStory Tracker records and relays granular

12   behavioral signals — including clicks, scrolls, movements, and timing events — together

13   with unique identifiers labeled "UserId," "SessionId," and "OrgId." These identifiers

14   operate as addressing and routing markers that tie the intercepted transmissions to a

15   particular individual session, browser instance, and device. The live replication of these

16   transmissions to FullStory's remote servers constitutes an interception of electronic

17   communications.

18         182.    In addition to the contemporaneous interception of user activity, the

19   FullStory Tracker collects addressing, routing, and signaling information that identifies

20   the path and structure of communications (separately from the content thereof). The

21   metadata transmitted includes the host domains, connection parameters, timing

22   sequences, and other signaling fields that enable FullStory's servers to reconstruct

23   session continuity and communication flow.

24         183.    By embedding the FullStory Tracker into the Website, Defendant enabled

25   a third-party analytics provider to receive, store, and replay users' real-time

26   communications with the site. This arrangement transformed the Website into a live

27   surveillance interface through which behavioral data and communication metadata were

28   continuously siphoned to FullStory's infrastructure. The resulting collection supports

Defendant's broader objectives of behavioral profiling, data monetization, and targeted marketing.

184.    Figure 21 below shows multiple HTTPS requests initiated from the domain m.maccosmetics.com to external endpoints identified as edge.fullstory.com, 17de4c11.akstat.io, rs.eu1.fullstory.com, and edge.eu1.fullstory.com. The table lists paired fields labeled "Name," "Path," "Url," "Method," "Domain," and "Time," including entries such as fs.js at /s/fs.js using the GET method to edge.fullstory.com/s/fs.js, ?h.d=macc… using the GET method to 17de4c11.akstat.io/?h.d=maccosmetics.com…, and /rec/bundle/v2 using the POST method to rs.eu1.fullstory.com/rec/bundle/v2?OrgId=o-ZHZ-eu1&UserId=f91faf45-4a83-47e…. The sequence also includes POST requests to rs.eu1.fullstory.com/rec/page and a GET request to edge.eu1.fullstory.com/s/settings/o-ZHZ-eu1/v1/web. Each entry records the method, host domain, and time in milliseconds, showing a series of outbound network transactions between the browser and FullStory's servers. The displayed data provides verifiable network records documenting the addressing, routing, and signaling metadata through which the browser established and maintained live connections with multiple FullStory endpoints.

**Figure 21:**



CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

185.   Figure 22 below shows a sequence of HTTPS communications between the user's browser and the external host rs.eu1.fullstory.com. Each entry records a 200 status response over the HTTPS protocol to the path /rec/bundle/v2 … [full URL omitted]. The accompanying parameter table displays paired fields labeled ClientTime, OrgId, PageId, SessionId, and UserId, along with additional signaling values such as DeltaT, Seq, and ContentEncoding = gzip. These identifiers and timing markers appear together within the same transaction record, demonstrating that the browser transmitted session-specific metadata—time stamps, session and user identifiers, and sequential counters—directly to the FullStory endpoint during live page activity. The displayed data provides verifiable evidence of addressing, routing, and signaling exchanges that capture user-session context in real time, constituting the network-level metadata relevant to evaluating interception and transmission-recording activity.

**Figure 22:**



186. Figure 23 below shows a DNS resolution for the hostname 17de4c1f.akstat.io, beginning with a "Standard query 0x8309 A 17de4c1f.akstat.io" followed by a "Standard query response 0x8309 A 17de4c1f.akstat.io CNAME

1  wildcard46.akstat.io.edgekey.net        CNAME        e4518.dscx.akamaiedge.net        A

2  184.27.178.197." These records confirm that the browser resolved the akstat.io domain

3  through Akamai's edge network to reach a FullStory-associated endpoint. The displayed

4  data provides network-layer addressing evidence showing that FullStory's telemetry

5  passed through Akamai edge servers (akstat.io). Under CIPA Section 638.51(b), this

6  constitutes "dialing and addressing information" and corroborates that FullStory

7  operated through a third-party content-delivery network.

8  <u>**Figure 23:**</u>



21  187.  Figure 24 below shows key–value entries including "_fs_uid," "_fs_lua,"

22  "fs_songs:1," "_rmco," and "_boomr_akamaiXhrRetry," each containing unique

23  identifiers, timestamps, or structured metadata. Several additional entries such as

24  "_uetsid" and "_uetvid" appear with expiration dates and session identifiers. The

25  displayed data shows persistent identifiers saved on the user's device, enabling FullStory

26  to re-associate future browsing sessions with the same user. This evidence provides

27  network-layer metadata establishing unique session and persistent user identifiers.

28  / / /

**Figure 24:**



188.    Figure 25 below shows a Fiddler capture documenting a POST request from the user's browser to rs.eu1.fullstory.com over HTTPS. The request originated from maccosmetics.com, as shown by the "Referer" and "Origin" fields, and included cross-site indicators such as "Sec-Fetch-Site: cross-site" and "Connection: keep-alive." These fields confirm that the user's browser connected to an external FullStory endpoint during the session. The capture demonstrates that signaling and addressing data—including protocol, host, and request headers—were transmitted from the user's device to FullStory's remote server in real time. The displayed evidence provides verifiable network-layer proof of a live external connection containing dialing and addressing information establishing that FullStory received transmission metadata from the user's device through a third-party connection.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 25:**



189.   Figure 26 below shows a Fiddler capture containing a structured list of query-string parameters identifying a live outbound transmission to a FullStory endpoint. The visible entries include "cdim.domain: m.maccosmetics.com," "cdim.FullStory_URL: https://app.eu1.fullstory.com/ui/o-ZHZ-eu1/client-session/4cad89b1-95d9-42f0-a63c-…[full URL omitted]," and "rt.ss: 1761299289548," among others. Each field represents real-time request data generated during a user's active session, including timestamps ("rt.end: 1761299571266") and unique session keys ("UserId," "h.key: 4L5Y7-LGDHQ-ZEAMD-9CRWB-HJQCB"). This demonstrates that session identifiers and timestamps were transmitted immediately as the user interacted with the Website, reflecting live behavioral capture rather than deferred or aggregate logging. The displayed data provides verifiable evidence of real-time browser-to-server transmissions containing addressing, routing, and signaling metadata and shows that FullStory recorded and associated these transmissions with persistent identifiers.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 26:**



190.   Figures 21 through 26 together demonstrate how the Website's embedded FullStory scripts captured, stored, and transmitted users' interactions in real time through a persistent telemetry pipeline. The sequence of artifacts shows that the browser loaded FullStory code from edge.fullstory.com, resolved its telemetry domain through Akamai (akstat.io), and exchanged live session packets with rs.eu1.fullstory.com as the user navigated the site. The associated CSV and Fiddler captures reveal continuous outbound requests containing timestamps, user IDs, session IDs, and page identifiers, proving that FullStory was recording behavioral events as they occurred. Additional cookie and local-storage data confirm that unique identifiers were written to the user's device before any consent interface appeared, allowing later re-identification across sessions. Collectively, these figures depict a unified system in which FullStory acted as a remote recipient of signaling, routing, and addressing information—including session keys and device-linked identifiers—constituting "dialing and addressing information" under CIPA § 638.51(b), and establishing that communications were intercepted, stored, and transmitted to a third-party endpoint in violation of § 631.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

191.   Defendant surreptitiously installed, executed, and embedded the FullStory Tracker onto users' browsers by deploying JavaScript code that triggers communication with FullStory's remote recording infrastructure. When a user visits the Website, their browser automatically executes this code, initiating outbound requests to FullStory's servers at domains including edge.fullstory.com, rs.eu1.fullstory.com, and akstat.io, and transmitting user metadata such as IP address, full page URL, session identifiers, and timestamps. These transmissions occur silently and without user action, enabling FullStory to observe and record user interactions in real time.

192.   The FullStory Tracker is at least a "process" because it is software that records, organizes, and correlates data reflecting users' communications with the Website.

193.   The FullStory Tracker is at least a "device" because it operates through software installed and executed on computing equipment under Defendant's control and users' browsers. See, e.g., James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

194.   The FullStory Tracker initiates live connections to its telemetry infrastructure immediately upon page load, capturing metadata including session IDs, user IDs, page paths, timestamps, and other addressing and routing values. These constitute "dialing, routing, addressing, and signaling information" within the meaning of CIPA § 638.51(b).

195.   Users do not intentionally initiate communication with FullStory; the connection is automatically triggered in the background by embedded third-party code deployed by Defendant. Through this mechanism, FullStory intercepts and stores data that reveal the content and context of the user's communication session with the Website. This constitutes unauthorized simultaneous interception of communication and acquisition of addressing information under CIPA §§ 631 and 638.

196.   Defendant never obtained a court order authorizing the installation of a pen register, trap-and-trace device, or equivalent process, and did not obtain Plaintiff's or

1  Class Members' express or implied consent to install or execute the FullStory Tracker
2  on their browsers or to transmit metadata to FullStory's remote servers.

3      197.    Accordingly, Defendant's use of the FullStory Tracker constitutes an
4  unlawful interception of communication and an unauthorized capture of "dialing,
5  routing, addressing, and signaling information" in violation of CIPA §§ 631 and 638.

6  **4.    *The Contentsquare Tracker***

7      198.    The ContentSquare Tracker, delivered via the domain c.contentsquare.net,
8  is a third-party session-replay and analytics script operated by ContentSquare SAS. On
9  the Website, this tracker is embedded within the page source and executes automatically
10 when a user visits the homepage. During the homepage session, the ContentSquare script
11 initiated outbound requests to c.contentsquare.net and csxd.contentsquare.net, including
12 payloads referencing "/uxa/" and "/rum/collect" endpoints. These transmissions
13 included metadata fields identifying the active page, session timing, and device
14 configuration, all transmitted silently and without user interaction, confirming that user
15 sessions were recorded in real time for behavioral monitoring and interaction analysis.

16     199.    The ContentSquare Tracker functions by recording granular behavioral
17 events—such as scrolls, clicks, and cursor movements—using JavaScript code that
18 captures and transmits those events to ContentSquare's servers. The session data is
19 indexed by persistent identifiers and correlated with timestamps, browser attributes, and
20 session continuity variables. These mechanisms allow the reconstruction and mapping
21 of user behavior across multiple visits, linking discrete sessions to the same individual.

22     200.    The ContentSquare Tracker performs identity correlation by associating
23 session identifiers with other browser-level signals, including stored cookies and local
24 device identifiers. Through this process, ContentSquare can connect behavioral metadata
25 collected from separate visits, effectively creating a continuous record of a user's on-site
26 interactions. This real-time collection and remote storage of session-level metadata
27 constitute the acquisition of "dialing, routing, addressing, and signaling information"
28 under CIPA § 638.51(b).

201.    By embedding the ContentSquare Tracker, Defendant enabled a third-party replay and analytics provider to intercept and capture the content and metadata of users' interactions with the Website without their knowledge or consent. These transmissions occur automatically as part of the page load process, allowing ContentSquare to receive communication-related data and session-level identifiers contemporaneous with the user's browsing activity. Defendant did not obtain a court order authorizing the installation of any pen register or trap-and-trace device, nor did it obtain the express or implied consent of users to capture or transmit these records to ContentSquare. Accordingly, the ContentSquare Tracker operates as both a "process" and a "device" under CIPA §§ 631 and 638, unlawfully intercepting and recording communication and addressing information transmitted during user sessions.

202.    Figure 27 below shows DNS query and response records referencing the domains t.contentsquare.net and c.contentsquare.net. The visible entries include standard query 0x0ae7 for t.contentsquare.net followed by a response listing A records 3.163.189.104, 3.163.189.120, 3.163.189.36, and 3.163.189.89. Additional entries show standard query 0x1090 for c.contentsquare.net and corresponding responses identifying CNAME c.bf.contentsquare.net and A record 3.215.254.142. The displayed data provides verifiable network evidence of the addressing and routing sequence through which the browser resolved multiple Contentsquare subdomains to specific IP addresses, documenting the signaling metadata and endpoint identification necessary to establish outbound connections to the remote host.

/ / /

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 27:**



203.   Figure 28 below shows HTTPS POST requests to the host c.contentsquare.net, including URLs beginning with /v2/events…[full URL omitted]. The visible entries include result codes 204 and 200, host c.contentsquare.net, and header fields such as Cache-Control: no-cache, Accept: /, Accept-Encoding: gzip, deflate, br, zstd, Accept-Language: en-US,en;q=0.9, and User-Agent: Mozilla/5.0 (iPhone; CPU iPhone OS 18_5 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko). Additional metadata shows Content-Length: 1500, Content-Type: text/plain;charset=UTF-8, Referer and Origin. The Host field identifies c.contentsquare.net and the connection is marked keep-alive. The displayed data provides verifiable network records evidencing the addressing, signaling, and transport metadata through which the browser transmitted structured event payloads to the external Contentsquare endpoint, documenting the complete routing and connection context for this exchange.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 28:**



204.    Figure 29 below shows a structured table of persistent cookies and local identifiers stored by the browser during the session, including names such as _cs_id, _cs_c, _abck, _fbp, _ga, _gcl_au, _uetvid, and tenant_web_key. Each record lists associated domains including maccosmetics.com, m.maccosmetics.com, youtube.com, ct.pinterest.com, bizrate.com, and tiktok.com, along with visible expiration dates extending into 2026. The table also includes entries such as _cs_id=20695f15-… and _mibhv=anon-176…, showing that these identifiers were saved on the user's device with future expiration values prior to consent. The displayed data provides verifiable session-state evidence of stored identifiers and cookie parameters associated with multiple third-party domains, documenting the addressing and signaling metadata through which the browser maintained stateful identifiers capable of re-associating future sessions with the same user.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 29:**



205.   Figures 27 through 29 collectively document the network and session-level activity associated with the Contentsquare Tracker on the Website. Figure 27 shows the browser resolving the domains t.contentsquare.net and c.contentsquare.net to multiple external IP addresses, establishing the addressing and routing path through which data was directed to Contentsquare's infrastructure and evidencing the collection of "dialing and addressing information" within the meaning of CIPA § 638.51(b). Figure 28 captures live HTTPS POST transmissions from the user's active browsing session to https://c.contentsquare.net/… [full URL omitted], including structured header fields such as Origin and Referer identifying the webpage context from which the transmission originated. These transmissions occurred contemporaneously with the user's interaction on the Website and duplicated session-specific data to a third-party server, constituting an interception of the contents of a communication in violation of CIPA § 631(a). Figure 29 shows that persistent identifiers, including _cs_id and _cs_c cookies, were written to the user's device before any consent interaction, enabling later re-identification of that same browser and continuity of subsequent session captures. Taken together, the data

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

reflected in Figures 27–29 establishes that Contentsquare both intercepted live user communications and separately collected network-layer signaling and addressing metadata without consent or court authorization.

206.   Defendant surreptitiously installed, executed, embedded, or injected the Contentsquare Tracker onto users' browsers by deploying third-party code that triggers continuous communication with Contentsquare's data-capture infrastructure. When a user visits the Website, the browser automatically executes this code, initiating outbound HTTPS requests to Contentsquare's servers at domains such as c.contentsquare.net and t.contentsquare.net. These transmissions convey user metadata including IP address, device type, page URL, and session identifiers. The transmission occurs silently and without any user action, allowing Contentsquare to record data reflecting user activity on the Website in real time.

207.   The Contentsquare Tracker is at least a "process" because it is software that identifies users, gathers data, and correlates that data across multiple browsing sessions.

208.   The Contentsquare Tracker is at least a "device" because software of this nature must operate on a computing device in order to execute its network transmissions. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).*

209.   The Contentsquare Tracker initiates a live connection to its collection infrastructure during each user session through automatic event-stream transmissions to c.contentsquare.net, including requests such as /v2/events… [full URL omitted]. These transmissions contain metadata such as session identifiers, timestamps, device information, and page context, which constitute routing and signaling information under CIPA § 638.51(b).

210.   The user does not intentionally initiate any communication with Contentsquare. The connection is automatically triggered in the background by third-party code embedded within the Website. As a result, Contentsquare contemporaneously receives and duplicates portions of the user's interaction with the Website, intercepting the contents of a communication in violation of CIPA § 631(a). At the same time, the

Contentsquare Tracker logs signaling, routing, and addressing information qualifying as a pen-register or trap-and-trace process under § 638.51(b).

211.    Defendant never obtained a court order permitting the installation of a pen-register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Contentsquare Tracker on their browsers or to collect or transmit data to Contentsquare.

212.    Consequently, the Contentsquare Tracker violates CIPA through the unauthorized use of a pen-register or trap-and-trace process and by contemporaneously intercepting the contents of user communications without prior consent or judicial authorization.

## VI.    CLASS ALLEGATIONS

213.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

214.    The Class does not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

215.    Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

216.    **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

217.    **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class

members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether the Trackers unlawfully captured the content of communications;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

218.    **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

219.    **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

220.    **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## VII.    FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

221.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

222.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

223.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

224.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    SECOND CAUSE OF ACTION

### Violation of Cal. Penal Code § 631

### *By Plaintiff and the Class Members Against All Defendants*

225.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

226.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

227.    California Penal Code § 631(a) prohibits any person from (1) willfully intercepting or attempting to intercept the contents of any communication passing over any wire, line, or cable; (2) reading, attempting to read, or learning the contents or

meaning of any such communication while in transit or being sent; or (3) aiding, agreeing with, or conspiring with another to do so, without the consent of all parties to the communication.

228.   Defendant violated § 631 by intentionally embedding and executing third-party session-replay code provided by FullStory, Inc. ("FullStory") and Contentsquare, Inc. ("Contentsquare") on the Website.

229.   When a user visits the Website, the FullStory and Contentsquare scripts automatically initiate outbound connections to remote servers operated by those companies, including but not limited to edge.fullstory.com, rs.eu1.fullstory.com, t.contentsquare.net, and c.contentsquare.net.

230.   These transmissions include user communications such as text entered into fields, clicks, mouse movements, scrolls, and the content displayed on the user's screen, which are duplicated and transmitted in real time to those remote servers without the user's knowledge or consent. The interception occurs contemporaneously with the user's interaction with the Website, enabling FullStory and Contentsquare to observe and record the substance of the communication as it takes place. Defendant's implementation of these scripts therefore constitutes the use of a device or process to intentionally intercept the contents of a communication in violation of California Penal Code § 631(a).

231.   The FullStory and Contentsquare software contemporaneously intercept user communications as they occur between the browser and the Website, transmitting them to remote servers where the data can be reassembled and replayed to reproduce the user's session. These transmissions include the actual contents of communications within the meaning of § 631(a), because they reveal the substance of what users view, type, and transmit while interacting with the Website.

232.   Defendant intentionally enabled, facilitated, and aided FullStory's and Contentsquare's unlawful interceptions by choosing to deploy and maintain the recording code, knowing that it caused user communications to be duplicated and transmitted to third parties for analysis, replay, and behavioral evaluation. Defendant did

1  not obtain the consent of Plaintiff or any Class Member to intercept, record, or disclose

2  the contents of their communications to FullStory or Contentsquare.

3       233.  Defendant never obtained any court order authorizing the installation or use

4  of any wiretapping device. By embedding and executing the FullStory and

5  Contentsquare scripts to intercept, record, and transmit the contents of the

6  communications of Plaintiff and Class Members without consent, Defendant violated

7  California Penal Code § 631(a).

8       234.  As a direct and proximate result of these violations, Plaintiff and Class

9  Members suffered injury and invasion of legally protected privacy interests. Pursuant to

10  California Penal Code § 637.2, Plaintiff and Class Members are entitled to statutory

11  damages of $5,000 per violation, injunctive relief, and such other relief as the Court

12  deems just and proper.

## IX.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Statutory damages pursuant to CIPA;

6. Prejudgment interest;

7. Reasonable attorney's fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

## <u>DEMAND FOR JURY TRIAL</u>

2      Plaintiff hereby demands a trial by jury on all causes of action and issues so

3  triable.

4

Dated:   November 12, 2025      Respectfully submitted,

5

6

7                              By: _/s/ Reuben D. Nathan_____
                               Reuben D. Nathan
8                              2901 W. Coast Hwy., Suite 200
                               Newport Beach, CA 92663
9                              Office: (949) 270-2798
10                             Email: rnathan@nathanlawpractice.com

11                             **LAW OFFICES OF ROSS CORNELL, APC**
12                             Ross Cornell, Esq. (SBN 210413)
                               P.O. Box 1989 #305
13                             Big Bear Lake, CA 92315
14                             Office: (562) 612-1708
                               Email: rc@rosscornelllaw.com
15

16
                               *Attorneys for Plaintiff and the Putative Class*
17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED